# EXHIBIT A

# Master Services Agreement

RATES AND CONTENTS ARE CONFIDENTIAL AND MUST NOT BE SHARED WITH ANY THIRD PARTIES

| KEY TERMS AND DEFINITIONS | | | |
|---|---|---|---|
| Client Name | Talkdesk, Inc. | Initial Term Start Date | 3/4/2020 |
| Client Address | 535 Mission St., San Francisco, CA 94105 | Initial Term (months) | 12 Months |
| Primary Contact | Andy Pham | Billing Terms | see Payment Timing |
| Primary Contact Email | andy.pham@talkdesk.com | Currency | USD |
| Primary Contact Phone | 6505615751 | | |
| Billing Contact | Jonathan Cook | | |
| Billing Contact Email | Jonathan.cook@talkdesk.com | | |
| Billing Contact Phone | 8013184077 | | |

| Services, Fees and Discounts | | | |
|---|---|---|---|
| **PRODUCT** | **Description** | **Weeks** | **Weekly Cost** |
| **Engineer.AI Build** | Development as per the Build Card | N/A | |
| **PRODUCT** | **Description** | **Months Committed** | **Guaranteed Discount Level** |
| **Builder Cloud Services** | | | |
| Ubiquitous Billing Service (UBS) - Standard | Operation of your Cloud Services (AWS, Azure, Google). UBS Standard offers greater flexibility and control BUT requires root access to your AWS account. | N/A | |
| Ubiquitous Billing Service – No Root Access | | 12 | 18% |
| **PRODUCT** | Description | Days | Cost |
| **One Click Migration** | Migration of your infrastructure to AWS Cloud services | N/A | |
| **Consulting Services** | Expert consultant services | N/A | |

Where a product is indicated as selected with an X the appropriate Appendix is deemed incorporated into this Agreement along with the General Terms and Conditions. In the event of any conflict between the General Terms and Conditions and any Appendix deemed incorporated then the terms of the Appendix shall have precedence.

This Agreement is made and entered into as of the Initial Term Start Date (also known as "Effective Date") between **Talkdesk, Inc.** and the relevant Engineer.ai Contracting Entity ("Engineer.ai" or "Company") having its Registered Address as detailed in Appendix A. Initial Term Start Date and Client are as specified in the Key Terms section of this Agreement. The Client's address will be used to determine the Client Territory. This address shall also determine the "Capacity Partner Territory".

**ACCEPTED AND AGREED:**

| **Engineer.ai** | **Talkdesk, Inc.** |
|---|---|
| Name: John Keefer | Name: Andy Pham |
| Signature: *(signed)* | Signature: *(signed)* |
| Title: Head of Revenue US | Title: SVP, Business & Counsel |

**General Terms and Conditions**

**Injunctive Relief**.  Company's obligations under this Agreement are of a unique character that gives them particular value; Company's breach of any of these obligations will cause irreparable and continuing damage to Client for which money damages are insufficient, and Client is entitled to injunctive relief, a decree for specific performance, and all other relief as may be proper (including money damages if appropriate), without the need to post a bond.  Client hereby agrees not to oppose any request by Company for such relief on the grounds that Company has an adequate remedy at law.

**Notices**.  Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile or electronic transmission, upon acknowledgment of receipt of such transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice shall be sent to the addresses set forth above or to such other address as either party may provide in writing.

**Governing Law**; This Agreement shall be governed by and construed in accordance with the laws of the Jurisdiction without regard to any conflicts of laws provisions thereof and the Parties hereby consent to the exclusive jurisdiction of the Nominated Courts. In any action or proceeding to enforce rights under this Capacity Partner Agreement, the prevailing party will be entitled to recover costs and attorneys' fees.

**Severability**.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision shall be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected.

**Waiver; Modification**.  If Client waives any term, provision or Company's breach of this Agreement, such waiver shall not be effective unless it is in writing and signed by Client.  No waiver by a party of a breach of this Agreement shall constitute a waiver of any other or subsequent breach by Company.  This Agreement may be modified only by mutual written agreement of authorized representatives of the parties.

**Entire Agreement**.  This Agreement constitutes the final and exclusive agreement between the parties relating to this subject matter and supersedes all agreements, whether prior or contemporaneous, written or oral, concerning such subject matter.

**Ownership.** The Engineer.ai Technology and all Intellectual Property Rights in it are the exclusive property of Company or its suppliers. Client assigns to Company any suggestions, ideas, enhancement requests, feedback or recommendations provided by Client related to the Engineer.ai Technology. Except for the license expressly granted to Client in this Agreement, no express or implied license or right of any kind is granted to Client regarding the Engineer.ai Technology or any part of it, including any right to obtain possession of any source code, data or other technical material relating to the Engineer.ai Technology. All rights not expressly granted to Client in this Agreement are reserved to Company.

**Local Law.** Client acknowledges its responsibility to ensure that its use of the Services is permitted under the laws of its jurisdiction(s) and the jurisdictions in which the Services are used.

**Fees.** Client shall pay the fees as specified in the Services, Fees and Discounts section of this Agreement.

**Payment Timing.** Client shall pay the amounts due pursuant to Company's invoices within forty five (45) days of Client's receipt of each such invoice except where the relevant Appendix details a different Payment or Credit Period. For purposes of clarity, payments may be made by credit card up to a maximum value of one hundred thousand dollars ($100,000) per invoice on the basis that the Client pre-authorizes the Company to make an immediate deduction from the credit card, up to this value, on issue of the invoice. Any credit card payment requested to be made by the Client in excess of this limit shall be considered at the sole discretion of the Company. The Client agrees to provide the Company with all necessary credit card details and written confirmations of authority to facilitate the above, on execution of this Agreement. Any invoice-related dispute with respect to which Client does not notify Company in writing within twenty-one (21) days of Client's receipt of the applicable invoice shall be deemed waived.

**Taxes; Payment Procedure.** All amounts payable under this Agreement exclude all applicable sales, use and other taxes. Client will be responsible for payment of all such taxes (other than taxes based on Company's net income), and any related penalties and interest arising from the non-payment or late payment. Amounts due under this Agreement and not paid by their due date shall incur interest at the rate of 2% per annum above the prevailing Federal Funds Rate from the due date until the date of actual payment, whether before or after judgment. Client shall be responsible for the reasonable collection costs (including without limitation legal fees and collection agency fees) incurred by Company in its efforts to collect such overdue amounts. Company shall be entitled, in its sole discretion, to withhold performance and discontinue provision of the Services until all amounts due are paid in full or to turn Client over for collection to a third party agency.

**Term.** Unless terminated earlier as permitted in this Agreement, the initial term of this Agreement shall be for a period commencing on the Initial Term Start Date set forth in the Key Terms and Definitions Section of this Agreement and ending after the Initial Term (the "**Initial Term**"). In addition, this Agreement may be terminated by:
- Either party, immediately upon written notice, in the event that the other party materially breaches this Agreement and such breach is not cured within thirty (30) days of written notice; or
- Either party, immediately upon written notice, if the other party becomes bankrupt, insolvent, fails to pay its debts as they become due, or otherwise ceases to conduct business in the ordinary course.

**Representations and Warranties.** Each party represents and warrants to the other that: (i) it has the full right, power, and authority to enter into this Agreement; (ii) the execution of this Agreement and performance of its obligations under this Agreement do not and will not violate any other agreement to which it is a party; (iii) this Agreement constitutes a legal, valid and binding obligation when agreed to; and (iv) it will maintain a privacy policy linked to from its corporate website's home page that discloses its practices regarding the collection, use and sharing of data and that complies with applicable laws and regulations, and will abide by such privacy policy. Client represents and warrants at all times that: (a) it has sufficient rights in and to

and has secured all necessary rights, releases and approvals in order to grant the licenses in this Agreement to Company. (b) it will not use Company infrastructure to upload any content that violates any applicable laws or regulations or any rights of any third parties, including but not limited to infringement or misappropriation of any copyright, patent, trademark, trade dress, trade secret, music, image or other proprietary or property right, or that is unlawful, fraudulent, threatening, defamatory, obscene, pornographic, profane or hateful, deceptive, libelous, hate-promoting or discriminatory or that encourages illegal behavior, or that includes or constitutes false advertising, unfair competition, invasion of privacy or publicity rights, or that contains any viruses, worms, Trojan horses, malware, spyware or other contaminants; and (c) it shall maintain a posted privacy policy accessible by direct link from the Client's home page that complies with all applicable laws and regulations and shall abide by such privacy policy

**Indemnification.** Each party (the "**Indemnifying Party**") will indemnify and hold the other party and its officers, directors, agents, Affiliates and employees (collectively, the "**Indemnified Party**") harmless from and against any and all third party claims, actions, liabilities, losses, expenses, damages, and costs (including, without limitation, reasonable legal fees) against the Indemnified Party (collectively, "**Claims**") arising out of or related to a breach by the Indemnifying Party of its representations and warranties under this Agreement. Client will defend, indemnify, and hold harmless Company, its directors, officers, Affiliates, employees and agents harmless from and against any and all Claims by any third party that the Client's Content, Media, Advertisements, Logos or Intellectual Property uploaded to Company's infrastructure or included in works developed by Company at the behest of Client violates such third party's rights. The Company will defend, indemnify and hold harmless Client, its directors, officer, affiliates, employees and agents harmless from and against any and all Claims arising out of or related to any of the Company's Intellectual Property and claims by any third party that such Intellectual Property violates third party rights. The foregoing indemnification obligations are conditioned on the Indemnified Party; (i) giving the Indemnifying Party notice of the relevant claim; (ii) reasonably cooperating with the Indemnifying Party at Indemnifying Party's expense, in the defense of such claim; and (iii) giving the Indemnifying Party the right to control the defense and settlement of any such claim, except that the Indemnifying Party shall not enter into any settlement that affects the Indemnified Party's rights or interest without the Indemnified Party's prior written approval. The Indemnified Party shall have the right to participate in the defense at its expense. In the event that the Indemnifying Party fails to defend and/or indemnify the Indemnified Party, the Indemnified Party has the right to defend or settle any claim on its own behalf though counsel of its own choice, and be fully reimbursed by the Indemnifying Party for all costs and expenses of such defense.

**Disclaimer; Limitation of Liability.** EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OR REPRESENTATION, WHETHER EXPRESS OR IMPLIED, OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, OR THOSE ARISING BY LAW, STATUTE, USAGE OF TRADE, OR COURSE OF DEALING. COMPANY DOES NOT GUARANTEE ANY OUTPUT OR RESULTS OF ANY OF THE SERVICES AND DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR: (I) ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION,

LOST PROFITS, LOST SAVINGS OR LOSS OF GOODWILL) SUFFERED OR INCURRED IN CONNECTION WITH THIS AGREEMENT, WHETHER UNDER TORT, CONTRACT OR OTHER THEORIES OF RECOVERY EVEN IF THE PARTY HAS BEEN OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF SUCH DAMAGES, NOR FOR: (II) ANY DIRECT DAMAGES IN EXCESS OF THE AMOUNT PAID TO COMPANY UNDER THIS AGREEMENT DURING THE IMMEDIATELY PRECEDING SIX (6) MONTHS FROM THE DATE IN WHICH THE CLAIM AROSE. THE PARTIES WAIVE ANY RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP OF PARTIES HEREUNDER.

No conditions, warranties or other terms apply to the Services, the Code, the Documentation or to any other goods or services supplied by Company under this Agreement unless expressly set out in this Agreement. To the fullest extent permitted by law, no implied conditions, warranties or other terms apply (including without limitation, any implied terms as to satisfactory quality, fitness for purpose or conformance with description).

Company does not guarantee any output or results of any of the Services or the Code and does not warrant that the Services will be uninterrupted or error-free. Nothing in this Agreement will exclude or limit either party's liability: (a) for death or personal injury resulting from the negligence of either party or their servants, agents or employees; (b) for fraud or fraudulent misrepresentation; (c) for payment of sums properly due and owing to the other in the course of normal performance of this Agreement; or (d) for anything which cannot be excluded or limited by law.

Neither party shall be liable under or in connection with this Agreement or any Order Form (whether in contract, tort, including, without limitation, negligence or otherwise) for any: (i) loss of profit; (ii) loss of anticipated savings; (iii) loss of business opportunity; (iv) loss of or corruption of data; (v) loss or damage resulting from third party claims; or (vi) indirect or consequential losses; suffered or incurred by the other party (whether or not such losses were within the contemplation of the parties at the date this Agreement was signed by the Parties).

Subject to the two sub-clauses above, each party's total aggregate liability to the other arising from any given event or series of connected events under or in connection with this Agreement, shall be limited to the amount paid or payable by the Client to Company under this Agreement in the six months immediately preceding the month in which the event (or first in a series of connected events) occurred.

**Confidentiality.** The parties acknowledge that, in the course of their dealings hereunder, each party and/or its employees, advisors, subcontractors, vendors, agents and representatives ("**Recipient**") may receive or otherwise become familiar with information about the other ("**Discloser**"), including but without limitation information about Discloser's technology, client order information, financial information, software, product roadmaps, business activities and operations, trade secrets, third party business relationships, and all other information disclosed or made available by Discloser to Recipient that is marked "confidential" or "proprietary" or that should otherwise be reasonably understood to be confidential or proprietary (the "**Confidential Information**"). Client hereby acknowledges and agrees that the fees and information regarding the operation of the Services constitute Confidential Information of Company. Recipient hereby agrees to take reasonable measures to maintain the confidentiality and secrecy of the Confidential Information of Discloser and to avoid its disclosure. Recipient agrees to limit access to the Confidential Information to those of its authorized employees, advisors, subcontractors, vendors, agents and representatives (collectively, "**Representatives**") who have a need to know

solely in connection with Recipient's performance or receipt of the Services contemplated by this Agreement or in connection with Recipient's enforcement of its rights hereunder. Client hereby warrants that such Representatives are, by reason of written agreement with Client or by operation of law, bound by confidentiality restrictions consistent with those contained in this Section with respect to such information, and that such written agreements include the right by the Company to enforce violation of these confidentiality restrictions against Representatives. Recipient will not attempt to reverse engineer the design or function of any of the Confidential Information of Discloser. Recipient shall have no obligation with respect to information which (i) was rightfully in possession of or known to Recipient without any obligation of confidentiality prior to receiving it from Discloser; (ii) is or becomes publicly available without breach of this Agreement; (iii) is rightfully obtained by Recipient from a source other than Discloser without any obligation of confidentiality; (iv) is independently developed by Recipient without use of Discloser's Confidential Information; (iv) is disclosed with Discloser's approval; or (v) is disclosed by Recipient under a valid order of a court or government agency, provided that Recipient provides prior written notice to Discloser of such obligation and reasonably cooperates with Discloser (at Discloser's expense) in Discloser's efforts to convince the court or administrative body to restrict or prevent the disclosure. Client agrees and acknowledges that: (i) Company may use and disclose information which it has collected or received in connection with the Services in an aggregated form that is not identifiable to Client or end users in order to provide, enhance, market or improve the Services.

**Miscellaneous.** This Agreement, including its Appendices and Schedules, set forth the entire understanding of the parties with respect to the subject matter hereof, and supersedes all other prior or contemporaneous representations, discussions, agreements and understandings between the parties with respect to the subject matter hereof, whether oral or in writing. No amendment to this Agreement shall be binding on either party unless reduced to writing and signed by both parties. Company may engage third parties to furnish services in connection with the Services, provided that such third parties have executed appropriate confidentiality agreements with Company. Client's Affiliate(s) may elect to receive Services under this Agreement and in such case, such Affiliate shall be considered "Client" under this Agreement with respect to its use or receipt of the Services as if such Affiliate had entered into a separate agreement with Company, and such Affiliate shall be responsible for its acts or omissions hereunder. Client may not assign, delegate or otherwise transfer this Agreement, whether by operation of law or otherwise, without Company's prior written consent. Any assignment in violation of the foregoing shall be void ab initio. Company may assign, delegate or otherwise transfer this Agreement, whether by operation of law or otherwise, to a Group Company as defined in Appendix A or in connection with a merger or sale of all or substantially all of its stock or assets or otherwise. Subject to the foregoing, this Agreement shall be binding on permitted successors and assigns. The waiver by either party of any breach or violation of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or violation hereof. The parties shall be deemed to be acting as independent contractors and shall not be deemed to agents, representatives, joint venturers or partners. Neither party is authorized to bind the other to any obligation, affirmation or commitment with respect to any other person or entity. Neither party shall be liable to the other for any non-performance or delay in the performance of any of its obligations hereunder

(excluding payment obligations) due to any cause beyond such party's reasonable control or due to acts of god, acts of civil or military authorities, terrorist acts, fires, labor disturbances, floods, epidemics, governmental rules or regulations, war, riot, delays in transportation, shortages of raw materials, shortages of services, power outages, or hacker attacks (each, a "**Force Majeure Event**"). This Agreement may be executed in counterparts which, when taken together, shall constitute one and the same instrument. This Agreement shall be construed as though both parties jointly drafted it. The captions in this Agreement are for convenience only and shall not affect its interpretation.

*Appendix A : Contracting Partner, Legal Jurisdiction and Courts*

Engineer.ai is Group Company with company subsidiaries in a number of territories. Each of the Contracting Entities detailed in the table below are deemed Group Companies for the purposes of this Agreement. The definition of "Contracting Entity", "Principal Address", "Jurisdiction" and "Nominated Courts" are therefore determined by the location of the Client as per the following table;

| Company Territory | Contracting Entity | Principal Address | Legal Jurisdiction |
|---|---|---|---|
| Americas (USA, Canada, Mexico and all South America) | Engineer.ai Corp. | 6300 Arizona Circle<br>Los Angeles<br>CA 90045<br>USA | State of California, USA |
| India | Engineer.ai India Private Limited | Ground Floor,<br>Building No 77B,<br>IFFCO Road,<br>Sector 18,<br>Gurgaon,<br>Haryana 122015,<br>India | India |
| All other | Engineer.ai Global Limited | 15 Westferry Circus<br>Canary Wharf<br>London<br>E14 4HD<br>United Kingdom | England & Wales |

### Appendix B: Ubiquitous Billing Service Terms

By using the services from Engineer.ai and Builder Cloud , you agree and accept all the terms and conditions contained in this Appendix in order to access the services from https://www.builder.ai/builder-cloud (the 'Site') and related software and services (Collectively the 'Builder Cloud Platform')

1.      WHEREAS:

a)      ENGINEER.AI on the strength of its agreement with Amazon Web Services Inc., hereinafter referred to as AWS, providing the online database access & retrieval services (OIDAR) in the name of Amazon Web Services (AWS), assumes the responsibility of billing and collection of payments for the services of AWS received by the client,

b)      The client is desirous of getting the billing of certain services being received from AWS, (for which it has signed separate agreement with AWS) done by / from ENGINEER.AI.

NOW based on the above premises and in consideration of the mutual covenants, terms and conditions contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

2.      Scope of the Agreement

The agreement covers the terms and conditions subject to which the billing of client's usage of AWS services will be shifted to ENGINEER.AI.

3.      Billing Shift Process

3.1     The process followed for shifting of billing from AWS to ENGINEER.AI, shall be as per Schedule 1 below C.

3.2     Post acceptance by the client, all AWS usage for the accounts identified by client in that particular billing cycle shall shift to ENGINEER.AI. The client shall have the right to remove or add AWS accounts to its billing through ENGINEER.AI in its sole discretion. All AWS usage cost of the client prior to acceptance, if any shall be billed to client by AWS directly as per their existing process.

4.      Billing Process

During the tenure of the Agreement, both parties agree to the following billing process:

4.1     Billing of the client shall change to ENGINEER.AI through a billing shift process as detailed in this Agreement read with Schedules 1, 2 and 3. The Client will sign and return to ENGINEER.AI a signed letter in the form set out in Schedule 2 on execution of this Agreement.

4.2     ENGINEER.AI shall raise a final Invoice to the Client on 4th day of every month based on the Clients' AWS usage cost.

4.3     In event of Client buys any service of AWS for which the payment is to be made instantly and is deducted from the account of ENGINEER.AI by AWS, ENGINEER.AI shall, raise an invoice to the client on the same day.

4.4     ENGINEER.AI can at any time opt to submit an interim bill should the usage exceed the internal credit controls.

5.      Payment Terms

5.1     Client shall make payment in full and without set off or deduction within 45 days. For the purpose of clarity, payments may be made by credit card up to a maximum value of one hundred thousand dollars ($100,000) per invoice on the basis that the Client pre-authorizes the Company to make an immediate deduction from the credit card, up to this value, on issue of the invoice. Any credit card payment requested to be made by the Client in excess of this limit shall be considered at the sole discretion of the Company. The Client agrees to provide the Company with all necessary credit card details and written confirmations of authority to facilitate the above, on execution of this Agreement.. The payments will be paid by Client to account details provided by ENGINEER.AI.

5.2     Payment for invoices arising out of clause 4.3 and 4.4 above shall be payable within forty five (45) working days from the date of invoice. Payment will be paid by Client to account details provided by ENGINEER.AI.

5.3     Any late payment between 0 and 30 days after the credit period shall result in the loss of discount for the following billing period.

5.4     Any late payment greater than 30 days after the credit period shall be liable to a penalty of 1% interest per week added to the bill which will be invoiced in the succeeding month.

5.5     Failure to pay after 60 days after an invoice is due may, at Company's option, be treated as a repudiatory breach of contract following which the Company can terminate immediately on giving written notice.

5.6     Any waiver of the penalties described in Clauses 5.3, 5.4 and 5.5 interest is at the sole discretion of ENGINEER.AI and shall not prevent its rights to apply such penalties in the future.


6.      Security Deposit and Interim Charges

6.1     If deemed necessary, ENGINEER.AI may ask for security deposit when the client is aware of large impending usage beyond normal or when previous delay in payments has occurred.

7.	Liability to Tax

7.1	Client shall be receiving service of online information and database access or retrieval service from AWS. This service on account of the location of the service recipient being in taxable territory shall be deemed to be provided within the taxable territory; hence liable to service tax.

7.2	ENGINEER.AI will raise an invoice every month and Client is liable to clear the entire amount as per this agreement.

8.	Permission for use of name/logo of the 'client' for reference

The 'client' agrees to allow ENGINEER.AI to use its name and logo only for the purpose of internal reference.

9.	Termination

9.1	Engineer.ai  may terminate this contract at any time, and for any reason, by giving thirty days written notice of intent to terminate agreement to Client. During the initial term Client may cancel this agreement by providing Engineer.ai 30 day written notice of intent to terminate this agreement, only if all sums due under this Agreement have been paid in full at the date written notice is intended to be served on Engineer.ai.

9.2	Without prejudice to other rights or remedies, both the parties may terminate this agreement immediately if any of the party breaches any of the terms or conditions of this agreement and such breach remains un-remedied for ten calendar days after the receipt of written notice of such breach.

9.3	In the event of termination the client is to clear all outstanding amounts in relation to AWS services provided by AWS and billed by ENGINEER.AI.

10.	The scope and instrumentality of change or modification in the agreement

10.1	This agreement can be modified only in a writing signed by both parties.


11.	Limitation

11.1	ENGINEER.AI assumes no liability for any issues related to use of AWS services for any consideration whatsoever.

*Schedule 1*

Bill Shifting Process

Process followed for bill shifting in respect of the client who does not have linked accounts to their Master Account is as follows:

i)      Client to ensure that there is no default or outstanding on AWS

ii)     ENGINEER.AI to request for billing shift in their console
iii)    Client will be declined access to AWS for direct bills for AWS usage
iv)    Client to get the request through email (apn@ENGINEER.AI.com).
v)     Client to accept the request for shifting of bill to commence the shift.
vi)    Billing is shifted to ENGINEER.AI for all usage of AWS post acceptance.

Process followed for bill shifting for client who does have linked accounts to their Master Account is as follows:

i)      Client to ensure that there is no default or outstanding on AWS .
ii)     Client to delink billing of their linked accounts so that each linked account has active Master Account.
iii)    Client to provide details of AWS Master Accounts and email id's associated with them to ENGINEER.AI.
iv)    ENGINEER.AI to request for billing shift in their console.
v)     Client to get the request through email (apn@ENGINEER.AI.com) for all accounts.
vi)    Client to accept the request for billing shift to commence the shift.
vii)   Billing is shifted to ENGINEER.AI for all usage of AWS post acceptance.

For the purpose of this annexure billing shift process means the process of shifting the raising of bills from AWS to ENGINEER.AI.

******

*Schedule 2*

[ASSIGNOR NAME]

[ASSIGNOR ADDRESS]

[ADDRESS]

Attention:

[DATE]

Re: Consent to Assignment of AWS Accounts between [ASSIGNOR] and Amazon Web Services, Inc. Dear _____:

In connection with the transfer of AWS accounts by [ASSIGNOR] ("Assignor") to [ASSIGNEE] ("Assignee"), Amazon Web Services, Inc. ("AWS") hereby consents to the assignment, effective as of [INSERT DATE] ("Effective Date"), by Assignor to Assignee of the AWS Accounts identified in the attached Exhibit A ("Accounts") created under the AWS Client Agreement, located at http://aws.amazon.com/agreement/, by and between AWS and Assignor ("Assignor AWS Client Agreement").

All other terms and conditions of the AWS Client Agreement remain in full force and effect, and as of the Effective Date, Assignee hereby agrees to be bound by the terms of the AWS Client Agreement by and between AWS and Assignee ("Assignee AWS Client Agreement"). On and after the Effective Date, the Accounts will be governed by the Assignee AWS Client Agreement and the Authorized AWS Value-Added Reseller Agreement by and between AWS and Assignee with the effective date of [INSERT DATE] ("Reseller Agreement"), so long as the Accounts meet the requirements of "Reseller Accounts" under the Reseller Agreement. Assignee will be responsible for all fees and charges due to AWS under the Accounts, regardless of whether such fees and charges were accrued before or after the Effective Date. Assignee will ensure that, as of the Effective Date, Assignor (as the "Client" of Assignee under the Reseller Agreement) expressly agrees to the AWS Client License Terms pursuant to the Reseller Agreement.

Amazon Web Services, Inc. ・ 410 Terry Avenue N. ・ Seattle, WA 98109

***Appendix C : Builder Cloud Ubiquitous Billing Service – No Root Access Additional Terms***

The terms of this Appendix C are deemed incorporated into the Agreement with the following terms;

The Client hereby agrees to the following supplementary terms to benefit from the discounted cloud services provided by AWS's Elastic Computing Cloud ("EC2") through Engineer.AI's purchasing of Reserved Instances without giving Root Access to their account credentials.

Reserved Instances allow the Client savings on EC2 costs compared to on-demand instance pricing. Reserved Instances are billing discounts applied to the use of on-demand usage through your account. A Spot Instance is an unused EC2 instance that is available for less than the on-demand price.

1. The Client agrees not to purchase Reserved Instances, Spot Instances, or other savings plan directly from AWS for the duration of the Agreement. In the event the Client breaches this term, Engineer.ai reserves the right to remove any discount that has been applied to the Client under this Agreement with immediate effect, and without prejudice to any other remedies that may be available to Engineer.ai.

2. In order to receive the UBS discount, the Client agrees to increase their monthly growth in usage at a rate equivalent to 100% per annum ('Growth Rate Target'). The Growth Rate Target will be measured month to month unless otherwise agreed in writing. If the Client's usage falls below the Growth Rate Target, Engineer.ai reserves the right to withhold any discount offered under this Agreement until the Client's usage exceeds the Growth Rate Target again.

3. The Clients acknowledges that the Partner, Engineer.AI, purchases Reserved Instances at a master account level and without requiring any commitment from the Client.

    a. As such, the entire benefit is passed to the Client on the "Original" AWS invoice which is available in the Client's console. This is not reflective of the discount set out in the UBS Agreement, where the difference between Spot/OnDemand and Reserved Instances is shared with the Client.

    b. As such, the Client waives their right to contest the invoice, escalate to Amazon Web Services or otherwise broadcast any difference between the invoice provided by Engineer.AI and that available on AWS Console.

4. The Client agrees not to reverse engineer the calculation of the margin share under this Agreement; and is subject to a minimum $50,000 fine for each and every breach.

5. The Client can ask Engineer.AI for a detailed breakdown of their invoice and Engineer.AI shall be required to provide such breakdown within 14 days of the request.

6. In the event that an examination of the breakdown provided under the terms of Clause 5 of this Appendix shows a discrepancy or error greater than 5% in favor of the Client then Engineer.AI shall remit such discrepancy or error to Client within 14 days and meet any reasonable costs incurred by Client in processing such examination.